Filed 1/8/16  In re Andy M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ANDY M. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D068163, D068337 |
| Plaintiff and Respondent, | (Super. Ct. No. J518952) |
| v. | |
| JAIME M., | |
| Defendant and Appellant. | |

CONSOLIDATED APPEALS from an order and a judgment of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Jennifer Stone, Deputy County Counsel, for Plaintiff and Respondent.

Jaime M. (Mother) appeals the juvenile court's order denying her modification petition for reunification services and its subsequent order terminating her parental rights over her son, Jordan M. Mother argues the trial court abused its discretion in denying modification of reunification services because she showed a change in circumstances and modification was in Jordan's best interest. Mother also contends the juvenile court erred by declining to apply the beneficial relationship exception to termination. We affirm.

Mother's notices of appeal indicate that her appeal also pertains to her son, Andy M. However, Mother did not make any arguments concerning Andy. Accordingly, we do not address the trial court's orders as to Andy. (*Garcia v. Seacon Logix, Inc.* (2015) 238 Cal.App.4th 1467, 1489 [matters not raised in an appellate brief are forfeited].)

FACTUAL AND PROCEDURAL BACKGROUND

Mother and David M. (Father) were the adoptive parents of Jordan (age 3), Andy (age 7), and Danny M. (deceased in 2014 at age 3). Mother and Father also had two biological children, Aubrey (age 12) and Levi (age 1).

In April 2014, Father called 911 to report that Danny was not breathing. Police arrived at the home and discovered that Danny had died. The medical examiner ultimately concluded Danny died as a result of dehydration.

Dr. Wendy Wright, a child abuse expert at the Chadwick Center at Rady Children's Hospital, examined Aubrey, Andy and Jordan. Dr. Wright stated Aubrey and Jordan were healthy overall, but Andy's screening revealed "definite evidence of physical abuse." Andy had bruises on the back of his legs that were inconsistent with Andy's explanation that he sat on the toilet for too long. Dr. Wright also observed a strange

2

pattern of redness on Andy's feet, scarring on his upper back and a bruise on the shaft of his penis.

The San Diego County Health and Human Services Agency (Agency) filed petitions on behalf of Andy and Jordan. Jordan's petition alleged he was at risk because of the circumstances surrounding Danny's death and the nature of Andy's injuries. The court removed Jordan and Andy from the parents' care. The Agency placed Andy and Jordan in a foster home with two female caretakers.

Andy told the investigators that his parents told him not to talk about his "boo-boos." Andy stated he was "[h]appy" about not going back to his parents because he did not want to get any more "marks or bruises." He described standing in a time out with his hands behind his back from "day till night." He disclosed that his parents caused the bruises on his back and legs. Andy also stated his Father spanked him with a rod and a "switch," which "really hurt[]."

The caretakers had concerns for Jordan because he had many developmental delays, including inability to chew his food, delayed gross motor skills, lack of muscle tone, and was wobbly and unstable. Jordan only used five or six words. Father and Mother continued to offer no explanation about how Andy obtained his bruises or how Danny died.

The Agency amended the petitions it had filed on behalf of Andy and Jordan. The amended petitions added allegations that the parents perpetrated acts of cruelty on Andy, and Jordan was at risk of substantial harm based on the parents' actions. At the jurisdictional and dispositional hearing, the parents waived their rights to reunification

3

services as to Jordan and Andy. The court provided reunification services as to Aubrey and Levi.

The parents consistently visited with Jordan between April and September 2014. Overall, the parents were caring and attentive during these visits and demonstrated a parental role. However, by August 2014, visitation staff reported that Jordan separated easily from his parents without exhibiting discomfort or emotional distress.

In November 2014, Dr. Katherine Ellis-Hernandez diagnosed Mother with obsessive compulsive personality disorder. According to Dr. Ellis-Hernandez, Mother went to great lengths to present herself as optimistic, but became evasive and avoidant when discussing Danny's death and the removal of Jordan and Andy from her care. Dr. Ellis-Hernandez further stated that Mother's personality traits may impede Mother's ability to meet her children's emotional and behavioral needs in a flexible manner.

In late 2014, the Agency reported that Mother was making great progress in a child abuse prevention program. However, Mother would not address how Danny died or Andy became injured. Mother also had limited knowledge of the reasons that led to the removal of the children from her care. The Agency noted that although Jordan was in good physical health, his chronological and developmental age placed him at greater risk for maltreatment and neglect because he completely relied on his caretakers to meet all of his physical and emotional needs. Based on the Agency's assessment, the parent-child relationship was not significant and did not outweigh the safety and benefits of an adoptive home.

In February 2015, Mother filed a petition under section 388 of the Welfare and Institutions Code requesting reunification services as to Andy and Jordan. (All further statutory references are to the Welfare and Institutions Code.) Mother stated that she had made good progress in her child abuse class, voluntarily completed two parenting classes, and participated in individual therapy. Mother claimed that reunification services were in the best interests of Andy and Jordan because Jordan had a strong bond with her and her biological children, and Mother was in the process of reunifying with her biological children. Mother claimed she had a safety network in place for the family, which included 11 people who rotated to check in on the family.

The Agency opposed Mother's section 388 petition for reunification services. The Agency noted that the progress Mother was making in her parenting and child abuse classes was tailored toward reunification with Aubrey and Levi. The Agency also took issue with Mother's claim that she created a safety network of 11 individuals because none of those individuals had contacted the Agency to inquire about Jordan or Andy.

The juvenile court found that Mother had failed to make a prima facie showing of changed circumstances and best interests as to Andy. As to Jordan, the court found Mother had made the required prima facie showing and set a hearing on the matter.

In May 2015, at the contested section 388 hearing, Karla Morales, a social worker, testified that Mother had consistently visited Jordan since July 2014 and that the visits went well. However, the parents were rigid and controlling during visits, asking Jordan to say "please" excessively. Morales also noted that Mother continued to deny what happened to Jordan's siblings while in Mother's home. According to Morales, the

5

Agency was not asking the parents to admit they caused injuries to Danny or Andy; rather, the Agency was looking for an acknowledgment that the injuries occurred while the children were in the parents' care.

The visitation monitor who had observed Mother's visits with Jordan stated that the parents took on a parental role and responded appropriately to Jordan during visits. Further, the visitation monitor did not believe the parents were overly demanding.

A social worker assigned to Aubrey's and Levi's case testified regarding a second psychological evaluation of Mother conducted by Dr. O'Meara. Dr. O'Meara did not find that Mother had obsessive compulsive personality disorder, but found she was rigid and inflexible and did not provide appropriate care for her adopted children. The social worker noted that despite two social services agencies instructing the parents not to use corporal punishment, Mother had a lack of insight regarding that subject.

The juvenile court denied Mother's section 388 petition, concluding she failed to show a change in circumstances or that granting the petition would be in Jordan's best interest. The court noted that the protective issues regarding Jordan and Andy were different than those involving Mother's biological children and Mother's services had been tailored to the issues of her biological children. The court also found that granting services was not in Jordan's best interest because of Jordan's strong bond with Andy and need for permanency.

In June 2015, the court held a contested section 366.26 hearing to determine a permanent plan for Jordan and Andy. Morales recommended keeping Andy and Jordan together in their current placement because they were bonded and attached to their

caregivers and had been with the caregivers for 14 months. Morales testified that Jordan enthusiastically returned to his caregivers' home after visits with his parents. Jordan separated from his parents easily without distress.

The juvenile court found by clear and convincing evidence that Jordan and Andy were likely to be adopted, terminated parental rights, and referred Jordan and Andy to the Agency for adoptive placement. With respect to the parent-child bond, the court noted that Jordan had consistent visits with his parents, but Jordan's relationship with his parents did not rise to a level that outweighed the benefits of adoption. Further, Jordan had been with his caregivers for more than a year, separated from his parents easily, looked to the caregivers in a parental role, and had developed "leaps and bounds" while placed in the caregivers' home.

## DISCUSSION

### I. *Modification Petition*

Under section 388, a parent may petition the court to change, modify or set aside a previously made court order. The petitioning party has the burden of showing, by a preponderance of the evidence, that (1) there is a change of circumstances or new evidence, and (2) the proposed change is in the child's best interests. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.) Whether a previously made order should be modified and whether a change would be in the minor's best interests are questions within the sound discretion of the juvenile court. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318*; In re Michael B*. (1992) 8 Cal.App.4th 1698, 1704.) The juvenile court's order will not be disturbed on appeal unless the court has exceeded the limits of legal discretion by making

7

an arbitrary, capricious or patently absurd determination. When two or more inferences reasonably can be deduced from the facts, we have no authority to substitute our decision for that of the trial court. (*In re Stephanie M.*, *supra*, at pp. 318-319.) Nor can we reweigh the evidence to come to a different conclusion than that reached by the trial court. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 812; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51-53.)

Mother argues she showed changed circumstances because she made substantial progress in resolving her parenting issues by participating in reunification services for Aubrey and Levi, including child abuse and parenting classes. Mother points out that the social worker who facilitated her child abuse prevention group rated her as a five on a scale of one-to-five in the areas of participation, homework, respect and language. The social worker rated Mother as a four in the areas of skill development, empathy, insight, and parenting skill development. While we commend Mother's participation in her services, we note that the same social worker who facilitated the child abuse prevention group stated that Mother continued to deny any knowledge of how Andy was hurt and what led to Danny's death.

Further, Mother's progress in her services was tailored toward reunification with Aubrey and Levi, not Jordan. Jordan had specialized needs due to his long history of trauma, dating back to abuse by his biological parents, and significant developmental delays. There was no evidence of changed circumstances regarding Mother's ability to address Jordan's specific needs. In fact, both of Mother's psychological evaluations

8

revealed personality traits, including rigidity and inflexibility, that made it difficult for her to respond to Jordan's emotional and behavioral needs.

Mother also argues she had progressed so far in her services that she was allowed to live with Aubrey and Levi in the paternal grandmother's home. This argument shows changed circumstances as to Aubrey and Levi, but not Jordan. Moreover, the social worker who recommended allowing Mother to live with Aubrey and Levi emphasized that she did not make an assessment as to Jordan and "there would potentially be a different assessment because of [Jordan's] different needs."

Mother next points to the safety network she created to show changed circumstances. Again, the social worker who testified about the safety network and its benefits stated that the network coupled with Mother's continued participation in services mitigated risks for Aubrey and Levi. The social worker did not feel prepared to discuss the issue as to Andy and Jordan.

Mother also notes that she presented significant evidence that her visitation with Jordan had improved dramatically. There is no dispute that Mother regularly visited with Jordan. The visitation monitor noted that the parents took on a parental role during visits. However, the evidence also showed that Jordan separated easily from his parents after visits without distress and was eager to see his siblings in the caregivers' home. Accordingly, Mother's visits do not show a change in circumstances.

Mother also failed to show that reunification services were in Jordan's best interest. It is troubling that Mother continued to deny knowledge of how Andy was injured and Danny died while in her care. Further, Mother did not recognize that she did

9

anything wrong and continued to believe in the use of corporal punishment. Lastly, Morales testified that it would be detrimental to Jordan to separate him from Andy. Under these circumstances, it was not in Jordan's best interest to provide Mother reunification services.

Based on the foregoing, we conclude the trial court acted well within its discretion in denying Mother's section 388 petition to modify reunification services.

## II. *Beneficial Relationship Exception*

Mother challenges the sufficiency of the evidence to support the court's finding the beneficial parent-child relationship exception to adoption is inapplicable.

Parental rights may be terminated if there is clear and convincing evidence of adoptability (§ 366.26, subd. (c)(1)); however, an exception exists where a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A beneficial relationship is one that promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with adoptive parents. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The parent must show that the parent-child relationship is such that the child will be greatly harmed by the termination of parental rights, so that the presumption in favor of adoption is overcome. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853-854.)

Implicit in this standard is that "a *parental* relationship is necessary for the exception to apply, not merely a friendly or familiar one." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) The existence of this relationship is determined by taking into

10

consideration "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)  "We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)

The Agency does not dispute that Mother maintained regular visitation and contact with Jordan.  As to the second prong of the test, we conclude that substantial evidence supports the juvenile court's determination that Mother did not meet her burden of establishing a beneficial parental relationship.  Satisfying the second prong requires the parent to prove that "severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed.  [Citations.]  A . . . parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

While Mother had pleasant visits with Jordan, she has not shown her bond with Jordan was sufficiently beneficial to invoke the beneficial parent-child relationship exception.  At the time of the section 366.26 hearing, Jordan and Andy had been in the same home with their caregivers for approximately 14 months.  Jordan separated easily from Mother after visits, was eager to return to his caregivers' home, and was bonded and

11

attached to his caregivers.  Importantly, Jordan was bonded to Andy and breaking that bond would have been detrimental for both of them.  Further, Jordan had particular needs that Mother had not shown she could adequately address.  In light of these facts, we uphold the juvenile court's conclusion that no beneficial relationship existed such that termination of parental rights would be detrimental to Jordan.

## DISPOSITION

The order denying Mother's section 388 petition for modification and judgment terminating her parental rights are affirmed.

McINTYRE, Acting P. J.

WE CONCUR:

AARON, J.

PRAGER, J.*

---

*        Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.